**Opinion issued August 6, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00120-CV

———————————

## IN THE INTEREST OF C.E.P., III, A CHILD

———————————

**On Appeal from the 308th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-03697**

———————————

## MEMORANDUM OPINION

This is an accelerated appeal[1] of the termination, following a bench trial, of

Father's and Mother's parental rights to their young son, Child.[2] In three issues,

Father contends that the evidence is legally and factually insufficient to support the

---

[1]    *See* TEX. FAM. CODE § 109.002(a-1); TEX. R. APP. P. 28.1, 28.4.

[2]    We use the aliases "Father," "Mother," and "Child" here to protect the
       individuals' identities and to reduce confusion. *See* TEX. FAM. CODE
       § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

trial court's findings under Family Code subsections 161.001(b)(1)(E), (N), and (O). In three issues, Mother contends that the evidence is legally and factually insufficient to support the trial court's findings under Family Code subsections 161.001(b)(1)(N), (O), and (b)(2). We affirm.

## Background

Child was born to Mother and Father in 2015. He was about three-and-a-half years old at the time of trial.

### I.     The Department's Current Involvement with Child

The investigation by the Department of Family and Protective Services (the "Department" or "CPS," as the trial witnesses and evidence sometimes refer to it) that led to this suit began while Child was in the hospital. He was admitted to the hospital in October 2016. He had suffered scalding burns, apparently from hot water.

On January 11, 2017, the Department "received a report alleging neglectful supervision of" Child. According to the report, Father and Mother

> were involved in an escalating argument with one another in which father was observed to "spit" on the mother 3 times. . . . [F]ather was subsequently arrested in the lobby of Children's Memorial Hermann Hospital after assaulting a hospital visitor who attempted to intervene on behalf of the mother upon observing the father attempting to assault the mother. . . . [T]he family has significant CPS history[,] and "there is believed to be ongoing family violence between the mother and father."

2

The Department's subsequent investigation led it to file this suit, seeking to terminate Father's parental rights to Child under Family Code subsections 161.001(b)(1)(E), (N), (O), and (b)(2) and to terminate Mother's parental rights under Family Code subsections 161.001(b)(1)(N), (O), and (b)(2). The trial court appointed the Department as Child's temporary managing conservator on April 19, 2017. Ultimately, the Department's plan was for Child to be adopted by a non-relative.

This suit went to trial in September 2018, but the trial court later ordered a new trial, which went forward without a jury in January 2019. After the January 2019 trial, the trial court rendered its judgment, terminating Mother's parental rights under statutory predicates (N) and (O) and Father's rights under statutory predicates (E), (N), and (O) and finding that the terminations were in Child's best interest. The trial court also appointed the Department as Child's sole managing conservator, which neither Mother nor Father challenge on appeal.

## II. Trial Testimony & Other Evidence

During the January 2019 trial, five witnesses testified: a law-enforcement officer, a hospital clinical social worker, the Department's caseworker, Father, and Mother.

## A. Law-Enforcement Officer's Testimony

Deputy J. Davison works for the Harris County Precinct 4 Constable's Office, patrolling Municipal Utility District No. 290. In the past, he has responded to calls for service at Mother's and Father's home for what he called "[f]amily disturbances; sort of information-type calls." He responded in four or five such instances involving Mother and Father from January 2018 to June 2018. According to him, a "family disturbance . . . occurs between two family members or two members of the same household" and "can be as little as a verbal argument between the two." The family disturbances involving Father and Mother to which Deputy Davison responded sometimes involved their children. But "most of the times that [he] ha[s] been to their residence, it involved [Father] and [Mother]."

On one occasion in summer 2018, Deputy Davison responded to Father's and Mother's home because their daughter "said that she was assaulted by" Father. Father told Deputy Davison "that he pulled her feet from underneath her because she was standing on the couch shouting or standing over him," that "he restrained her by holding her down," and that he was "attempting to get her in control." Deputy Davison added, however, that Mother "did not believe that anything that occurred was overdone or that anything took place that would be assault." Deputy Davison relayed what he learned to the district attorney's office. The office "stated

4

that that was not a case of abuse—that it was a case of the father disciplining the child." There was no "further reporting of that incident to the" Department.

Deputy Davison continued that he "ha[s] not been there to witness" any instance of Father and Mother "be[ing] physically combative" with each other. He testified that "[t]hey don't come [a]cross as overly aggressive most of the time. I believe just one incident which each individual in the case of them being a little too excitable." He also did not know of any allegation by either Father or Mother that the other had been physically combative.

Had Father shown signs of "fighting," Deputy Davison would have removed him from the scene. He has removed Father from the scene once. On that occasion, he put Father into a squad car so Father would calm down, and he did calm down.

## B. Hospital Clinical Social Worker's Testimony

Kristen Soudelier works as a "clinical social worker in the Pediatric ICU" for "Children's Memorial Hermann" hospital. In her role, she is "responsible for assessment of the patients and family when they arrive into the ICU." She also "work[s] with families providing support; resources; community resources; as well as too, if there is concern of abuse or neglect, making the appropriate referrals to Child Protective Services and/or law enforcement as well as assuring for a safe discharge." She testified that "the children in the families that [she] work[s] with [are] in some sort of critical medical situation."

Soudelier first met Child on October 11, 2016, when she "was asked to see him on the morning that he had been admitted" to the hospital. He was admitted "for scald burns to his head, face, [and] chest area." She saw Child's burns in person while he was in Intensive Care and "on a breathing machine." His burns "were pretty extensive to the patterns on the top of his head coming down to his face" and were on "multiple areas of his face, chest, and areas of that sort." During the first part of his hospital stay, Child was sedated due to the severity of his burns. Soudelier recalled that Child was discharged from the hospital on either February 1 or February 13, 2017.

During the hospital stay, Soudelier talked with Father and Mother. She performed "a psychosocial assessment on the family," which involves "[g]athering their demographic information; getting a better understanding from both of them on their account of what happened to the child that brought them into the hospital"; and investigating potential "substance abuse, mental health, [and] domestic violence in order to complete the full assessment."

Soudelier is not always able to perform psychosocial assessments for families due to time constraints, but Child's case "warranted a full assessment." This was because the physicians treating Child "were concerned that his injuries were not consistent with the story that was being told." And when Soudelier first met with Father and Mother, she too was concerned about "inconsistencies from

6

the story . . . that [Father] had in stated [sic] the amount of water could have caused that much damage to the child."

Soudelier was concerned about the family's "stability and their home environment as well as . . . some of the history that they had shared with [her]." She was concerned because Father and Mother "said that their relationship was . . . on the rocks. . . . [A]t first they said they didn't live together; they were separated; but then they were together. And [Father] had indicated he came over to help [Mother] as much as possible in the home, but they . . . were actually living together." She also was concerned about "CPS history" relating to Mother and to Child's having "tested positive at birth."[3] Shortly after his birth, the Department removed Child from Mother. And Mother "worked her services and d[id] what she needed to do" to get Child back. Nevertheless, Soudelier considered this earlier incident "a red flag."

She testified that, during Child's months-long hospital stay, Father and Mother visited Child less frequently than once a week. She noted that Father visited more often than Mother did. Soudelier's normal work hours, however, were 8:00 a.m. to 5:00 p.m., and she took some vacation days during Child's hospital stay. Her knowledge of Father's and Mother's visit frequency came from reports

---

[3] Mother later admitted that the positive test was for the presence of marijuana.

7

from others about whether Father or Mother had requested the hospital's available overnight room.

Father's and Mother's infrequent visits caused her concern: "There were several times we were not able to reach" them, and "[w]hen physicians needed consent, they had not a good working phone number like that when they were not at bedside." She "tried to offer resources to help them come and stay frequently." But the hospital was not always able to reach the parents.

When Father and Mother did visit, "there were several occasions"—about four or more—when "[Soudelier] did have to interject [sic] them because they were fighting." One of the fights involved "physically fighting." Father "was lunging towards [Mother] and coming aggressively towards her. [Soudelier] did not see him punch [Mother], but . . . we did have to separate him because he was lunging toward her." So Soudelier called security, and Father and Mother "were removed from the hospital." Soudelier also called security when Father and Mother "were found . . . at the valet in an altercation, and bystanders tried to come and help" Mother. Father "assaulted the bystander" and was arrested for assault. Soudelier did not witness this incident and "do[es]n't know what precipitated the fight." Child's hospital stay was a "highly emotional" and "stressful" time for Mother and Father. After the incident, Father "was told that he was going to get a no-trespass warning, and he was not allowed to come back" to the hospital.

8

Soudelier was also concerned about Mother's "ability to care for either herself or [Child] while she was at the hospital." According to Soudelier, Mother has some "disabilities": Mother "was at times or oftentime[s] found to have urine at the bottom of her wheelchair on the floor." Soudelier "tried to address that with her and tried to help her determine if she needed supplies, cat supplies, but she denied those services or those needs." This caused Soudelier, and "also the medical staff," concern because, "[d]ue to [Child's] open wounds and burns, it was very important that the environment has to be clean." But after Soudelier explained to Mother "that it was very important for her to remain hygienic so that [Child] wouldn't catch an infection," and "offered [Mother] resources to help with that problem," "incidents of unsanitary behavior continue[d]."

As for Father, Soudelier was concerned about his altercations with others and about his sometimes appearing "to be under the influence of a substance." She noted his "mumbled speech"; "unsteady gait"; "red eyes"; and, coinciding with instances of mumbled speech or unsteady gait, "aggressive behavior, where at times his general personality had been calm." These instances sometimes led Soudelier "to get security involved." On the other hand, she admitted, red eyes could have been from lack of sleep because of the stress on Father surrounding Child's hospitalization.

9

"Because of the nature of [Child's] injuries," it was "important that when he was ready for discharge that he be released to a home that was stable, safe, and clean." But Soudelier's concerns, "based on [her] interaction with them during the months that [Child] was in the hospital," undermined her confidence that Father and Mother could provide such an environment.

The "hospital attempted to provide resources to address the concerns that they had." But Father and Mother did not "take [Soudelier] up on" any of "the community resources" that were offered. They did, however, take her up on "the in-house resources—Ronald McDonald House and things like that." Soudelier spoke with Mother "about housing" and "about SSI, making sure they had the financial ability." Father and Mother told Soudelier that they had a house to live in and that they had SSI too. Soudelier's SSI-related concern was that Father and Mother had not yet applied for SSI for Child. But Father and Mother did report that they had the financial means to care for Child.

Then, "as [Child] got better," Soudelier developed other concerns about Father's and Mother's ability to care for him. To care for him, Father and Mother needed "to learn how to do medication; they had to do dressing changes; [and] they would have had to comply with the therapy that he would have needed—the occupational and physical therapy." They would have to be "educate[d] . . . on the proper care of the G-tube" that Child was discharged with to help him eat. They

did "come in for some of those classes" offered by the hospital. And "they did attend the classes" for wound-care training. But they did not "complete them to the point that [Soudelier] would have been comfortable with their ability to care for [Child] medically." Soudelier admitted that she has no personal knowledge of whether they completed the training, but she testified that she learned about it from notes in Child's medical records.

Soudelier last saw Child in February 2017, not long before his discharge from the hospital. She is not aware of what care Child needs now, whether specialized or otherwise. She is unaware of what training Mother has had since Child's discharge. And she admitted that she "ha[s] really nothing to offer in terms of the current situation for [Child], [Father], and [Mother]."

## C. Department's Caseworker's Testimony

Janison King was "a conservatorship worker for [Child]" and worked Child's case for the Department from about December 2017 to about October 2018. King testified that she had difficulty making and maintaining contact with Father and Mother during December 2017 and January 2018. All three "were kind of . . . playing phone tag." But, King admitted, Father did call her "on a number of occasions." For as long as King has been on the case, Father has not missed a court appearance, save for a time during which he was recovering from having been shot.

King testified that the Department created family service plans for Father and Mother, in part "to alleviate[] the concerns of the abuse and neglect." In January 2018, King and Father talked by phone, and they "went through the family plan of service" together. King also discussed with him Child's "short-term needs."

### 1.    Father's Family Service Plan

King testified extensively about Father's family service plan. Ultimately, he did not complete all of the services that the plan asked of him. His plan ordered him to "participate in random UA/hair follicle testing" for the presence of illegal drugs. But Father never submitted to a drug test, and there are no drug-test results for Father. King admitted, however, that the Department does not allege that Father used drugs.

Father's plan also ordered him to "maintain employment to ensure that all of [Child]'s financial needs are met" and to "maintain stable, clean, and clutter[-]free housing." Father explained to King that he was doing "little odds and ends for his father" to make money, but she testified that he was unable to provide her any proof that he was getting paid. Father was "in process of getting [SSI] started," but he did not "indicate [that] he was ever able to get that started" successfully. Father did not indicate to her "any other type of government assistance."

As for housing, Father and Mother indicated having an apartment together, but Father did not provide any lease agreement to prove it, nor has Father ever

requested that King visit his home. Part of the plan's housing requirement was that Father "give [caseworker] a copy of his lease as proof of residency" or, if in a month-to-month rental, "a letter from his management company stating his rent amount and [that] he [i]s a resident of the apartment."

Neither Father nor Mother ever asked King to see their homes. She otherwise "know[s] for a fact that [Father] has a house or an apartment of some sort," but she "just ha[s]n't been there." She has not personally contacted Father or his counsel "ask[ing] to be able to come to [Father's] home," including during the several times that she has been in court together with them. She does not know what condition Father's home is in. And, though she learned of their address in January 2018, she testified that there "was no point of going out to the home" because, "in January, we were getting ready for trial, but it kept getting reset and reset and reset."

Father's plan also ordered him to "participate in Individual Therapy and address his role and responsibility in the current CPS case and explore family[-]of[-]origin issues." The Department would pay for the therapy. Though the therapy facility tried to contact him, Father never started the therapy.

The plan also ordered Father to "submit to a Psychological Evaluation and provide honest and accurate information in order to determine what psychological needs exist" and to "follow all recommendations from this evaluation." The

Department would pay for this service too. Father "was referred for that service" but did not complete it.

Father's plan originally required him to (1) "participate in Anger Management in order to discover healthy alternatives to deal with and express anger"; (2) "participate in Domestic Violence Abuse Therapy to become educated about the risk and [e]ffects that domestic violence can have on both [Mother] and [C]hild's emotional, physical[,] and mental states"; and (3) "participate in BIPP (Battering Intervention and Prevention Training) for perpetrators of domestic violence" to "provide [him] with knowledge and understanding of domestic violence and the effects on it[]s victims." At trial, however, the Department's counsel announced what she referred to as a "stipulation": though "Father was to do BIPP, domestic violence, and anger management," "anger management and domestic violence were not actually part of his service plan" and "were stricken from his plan." Among these three original requirements, then, this left "only the BIPP class that he was ordered to complete."

King testified that Father presented his BIPP certificate to the court but that "he did not give that certificate to" her. And she testified that the judge acknowledged that Father had completed the BIPP requirement.

In sum, Father understood his plan's requirements—King discussed them with him. She recalled his telling her "that he was unable to successfully complete

14

his service plan because somebody tried to kill him" when a person shot him. King does not believe that "placing [Child] in an environment where somebody's trying to kill [Father]" is "a safe and stable environment for [Child]."

### 2. Mother's Family Service Plan

King also testified extensively about Mother's family service plan. Her plan ordered her too to "participate in random UA/hair follicle testing" for illegal drugs. She did not participate, despite being told about the requirement. As with Father, King admitted that the Department does not allege that Mother ever used drugs, nor had King read anything in the case file indicating that drugs were "an issue that brought [Child] into care." King only "sent [Mother] one time" for a drug test. There is no record of any drug-test result.

Mother's plan also ordered her "to maintain monthly face[-]to[-]face contact with Caseworker, as well as consistent bi-weekly or weekly contact with [Caseworker] to update on service progress." King testified that Mother "was not" "successful in that." King and Mother did not have "consistent contact"—they spoke only three times. They made contact in January 2018 and then had "more of a phone-tag type of deal" through March. King admitted, though, that "there was never any period of time where [Mother] completely disappeared and [King] didn't know where [she] was and was completely unable to make contact with her."

Mother's plan also ordered that she "participate in parenting classes" for six to eight weeks. King did not "talk with [Mother] about enrolling and completing parenting classes."

Like with Father's plan before the requirement was stricken, Mother's plan ordered her to "participate in Domestic Violence Abuse Therapy to become educated about the risk and [e]ffects that domestic violence can have on both her and [C]hild's emotional, physical[,] and mental states." Mother was to participate in this because of her relationship with Father, but Mother did not complete the service. To King, this service was "especially important" because "it would show [Mother's] ability to be able to be protective against [sic] her son; not only just herself, but also her son." After discussing it with Mother in January 2018, King did not "discuss with [Mother] completing that task" again.

The plan also ordered Mother to "maintain stable, clean, and clutter[-]free housing," including "giv[ing] [the caseworker] a copy of her lease as proof of residency" or, if in a month-to-month rental, "giv[ing] [the caseworker] a letter from her management company stating her rent amount and [that she] [i]s a resident of the apartment." Mother did not provide King with her lease agreement or "request for [King] to come to the home and view its suitability for [Child] to be placed back in that home." King also did not discuss Mother's living situation with her. But, according to King, an "investigator" told her that "the home was not

appropriate," "messy," and "dirty." However, King did not "talk with [Mother] about that" and "didn't make any arrangements to view that home as an appropriate placement."

At some point "during the pendency of this case, [Mother] was in a rehab facility," which the Department considers not to be "stable housing for a child to be placed" in. This was not a drug rehab but a medical rehab—Mother had an infection in her legs. Otherwise, Father and Mother lived together in an apartment for "[t]he majority" of the time the Department's current involvement with Child was ongoing.

Mother's plan in particular ordered her not to "allow [Father] access to the home to prevent [C]hild from being exposed to the risk of physical abuse and domestic violence." Theirs was an "ongoing volatile relationship" and was "a concern for the agency." It caused King concern that "at least in the last several months the police have still been called to their home four or five times." This suggested to King "that though [Father] has finished his BIPP class, perhaps there is more that he can learn regarding domestic violence." "[C]oncerns with ongoing domestic violence between" Father and Mother caused King concern "[b]ecause we don't know what type of environment the home is in if we place the child back in the home."

Mother's plan also ordered her to "participate in Individual Therapy and address her role and responsibility in the current CPS case and explore family[-]of[-]origin issues." Mother did not "complete that service," though it was offered to her at no cost. King did not talk with Mother about it.

The plan also required the "Psychological Evaluation" for Mother and that she "provide honest and accurate information in order to determine what psychological needs exist." This too would be free of cost to Mother, but King did not "get an assessment back from any provider" about such an evaluation taking place. King did not make a referral to Mother for such an evaluation.

### 3. Family History & Current Circumstances

In addition to explaining the parents' family service plans and whether they complied with them, King also testified about Father's, Mother's, and Child's history and current circumstances. Child had been the subject of an earlier proceeding with the Department. Father and Mother "completed all of their services" in that instance, "[a]nd so as a result they were able to get their children back."

This time, Child has "ongoing medical needs": "a G-tube" and "learning to eat solid food." So "the environment that he's living in" must "be clean and sanitary so that his G-tube is not infected." Mother and Father "have been aware that [Child] was on a G-tube and that he is getting occupational and speech

therapy . . . and physical therapy." But King does not recall talking with Mother "about her going and learning how to care for [Child]." King did not "discuss with [Father and Mother] at any time that they would need—particularly [Mother]— would need a special training on how to care for [Child]."

"During the pendency of this case," Father and Mother did not "visit with [Child]," nor "[d]id they request visits with [Child]," "outside of the hospital" until about 18 months into the case. Visitation was available to them though.

Then, in March 2018, Father asked to visit Child. He made more such requests after March too. And Mother requested a visit with Child "[i]ndirectly through [Father]" about two or three times, beginning in May 2018. King refused to set up a visit "[b]ecause, at the time, they had not had contact with [Child] in over a year."[4] King met with her supervisor and with Child's attorney *ad litem* about the request for visits. Afterward, she told Father that the Department "was not in agreement to continue his visits but that, if he wanted to, he should ask his attorney to have a special hearing." King admitted that, "if [Father and Mother] asked to see [Child] even to this day, if the court stated that they could see their child, and they asked to see their child, [King] would have to at least make some

---

[4]    King admitted that there was no court order in place, like there is in other cases, "that says that a parent can't have a visit until something else happens."

type of accommodations so they could see their child." Neither Father nor Mother asked the court to order visits.

Father told King that "he did not want to visit the child as long as [the visit] was at a CPS office." According to King, Father also told the court that he did not want to visit because "it would be hard on him to have to see [Child] when [Child] goes back home to a foster home." King testified that Mother gave similar reasons.

Father and Mother have not "been able to bond with [Child]" because they failed to visit him. Mother "has not had any contact with" Child while King has been the caseworker. Neither Father nor Mother gave birthday or Christmas gifts to Child. They did not "ask [King] throughout this case how [Child] was doing."

In sum as to Father and Mother, King testified that they "didn't complete the vast majority of the things that they needed to do" under their plans. The Department's effort "to return [Child] back with [Father and Mother]" was "creating this family plan of services" for the parents. But Father and Mother "were not compliant with the family plan of service." Had they completed the required services, King "might be having a different conversation" about her recommendations. Though Father asked to visit Child, King "did not set up a visit because [Father] did not complete his family plan of service. At that point, it had been maybe a little over a year since [Father] had contact with [Child], and it was not in [Child]'s best interest to see [Father] at that point."

King also testified about Child's current well-being. His current home is with a foster mother who is "able to take care of all of his needs." He has been there for about two years. He "is receiving occupational and physical therapy" because of his burns. And he "has improved drastically while he's in [foster mother's] care."

The Department believes it is in Child's best interest to terminate Father's and Mother's parental rights "to free [Child] up for adoption." The Department's goal for Child is "[u]nrelated adoption," and the foster mother wants to adopt. Child "refers to [foster mother] as 'mom,'" "[t]hey are very bonded," she "ha[s] other kids who [Child] call[s] 'brothers' and 'sisters,'" and they are "a well-knit family."

Aside from terminating parental rights, though, King admitted that the Department can pursue "family preservation," which allows for a permanent place for a child outside of the biological parents' home and for therapy for the child while "actually get[ting] to know his parents" and siblings. Terminating Father's and Mother's parental rights may result in Child "be[ing] cut off from all of his heritage," including "other siblings" and "aunts and uncles." The Department made efforts on this score though. It contacted "a maternal aunt" but did not place Child with her because she "did not want to deal with [Father]."

Another option is "PMC-ing[5] [Child] to the agency without terminating the parental rights." King does not "believe that's a good option for [Child]" "[b]ecause the child is only three," "[h]e has his whole life to live," the foster environment is "providing him with the love" and "meeting his short-term as well as h[is] long-terms goals," and "keeping him in the system would do a dis-justice [sic] to the child."

## D.    Father's Testimony

Then Father testified, largely in narrative format. Father testified that Child received his burn injuries in "an accident" when he "grab[bed] the hot water" in a cup that Father had just microwaved to make coffee. Father was cooking breakfast at Mother's house that day, attending to several tasks at once. Child was "running around" and grabbed the cup while Father was "turned around." He took Child to the hospital.

He did want to see Child again quickly. He disagreed with King's testimony about his not interacting with her "because the agreement that [Father] and the [other] judge made [regarding the BIPP course]—[King] wasn't [Father's] caseworker at the time." He also disagreed with King's timeline: he contacted her in January 2018, not March, to try to see Child. But King told his counsel at a court appearance, "no, I'm not gonna let him see his son."

---

[5]    We assume that King here is referring to "permanent managing conservatorship" for the Department.

Father left many voice messages for King but did not hear back. By the time of trial, Father "still ha[d]n't seen [Child]" even though, Father admitted, an "especially" long time "for a young child who is only three" had elapsed without seeing his parents.

Also, he could not visit Child when he was recovering from being shot. But he admitted that bringing Child into a home situation close in time to his shooting would be dangerous.

Regarding the argument at the hospital with Mother, Father did indeed "confront" her. He had just had oral surgery, resulting in wires being put in his mouth, so that is why "saliva was coming out of [his] mouth" when he was confronting her. The related assault on the bystander happened, Father testified, because the bystander was "putting all his body up on me and everything like that upon me, and he being extra." Nevertheless, Father admitted that he was "convicted of assault bodily injury" against the bystander, for which he received a 30-day sentence. And all this happened even after his classes from the Department's earlier case with Child taught him how to walk away from, or ease, confrontations.

The Department's earlier case was dismissed in part because Father took the classes that he was required to take. He "knew that [he] had to work [the] services

successfully in order to get [Child] back." A lot of the classes "had to do with addressing the domestic violence in [Father's and Mother's] relationship."

Mother and her other children with Father moved back in with him when they lost everything during Hurricane Harvey. Father and Mother do not currently live together though. They last lived together from September 2017 to June 2018.

As to the episode involving his daughter, Father testified that he disciplined his daughter but "didn't go to jail" for "assault" over it. Despite allegations, there is "no record" of him harming his children.

Father discussed some of the topics covered in his family service plan. Regarding the BIPP course, Father testified that the court allowed him to take the course in place of the separate anger-management and parenting courses because it "cover[ed] everything." He attended the BIPP classes. Also, he never was approached about a drug test. Finally, he knew he was to complete the psychological evaluation and was willing to complete it.

Father wants Child back and wants to raise him. Father denies abusing either Mother or Child and denies being "aggressive toward women." He is studying HVAC work now to make an income. He admitted that he was in prison from 2009 to 2012 for "[p]ossession of a controlled substance."

### E. Mother's Testimony

Mother was called to testify last. She testified that the cause of Child's burn injuries was an accident, despite any claim to the contrary. She was there when Child was burned. Child had grabbed the just-microwaved cup when Father turned around to do other cooking.

She also testified about her family service plan. She has seen it, and is "familiar with the tasks that are in it," but no caseworker ever "sat down with [her] and explain[ed]" it. She admitted that she has not "completed all of the tasks"—indeed, "[t]here's none in there that [she] ha[s] completed." She "do[es]n't really . . . have an excuse," and she "know[s] when you go through CPS, you have to do what they state for you to do because [she] went through it before, and [she] ha[s] done it all before." She has had about a year and a half to two years to complete the services.

She has been willing to complete the plan, but health problems and staying "in a facility . . . for a whole three months" hindered her. Also, she "lost everything" in Hurricane Harvey, requiring her to live with Father. She lived with him for about eight to ten months, then moved in with her sister. She has applied for housing assistance for a permanent home of her own.

As for other of her plan's requirements, the Department has not asked her to take any drug tests. She has not taken the six-to-eight-week parenting class. She

admitted that, though she underwent a psychological evaluation in the previous case with the Department, the court wanted her to do another evaluation in this case, and she did not do one. She also admitted to not speaking with her caseworker in this case, in contrast with the previous case with the Department.

She also was to "take a domestic-violence education program" and "domestic-violence therapy," but she did not do either.

She admitted that her plan required her "to participate in individual therapy." Therapy was helpful to her in the past. This time, she found her own therapist but did not have the therapist's reports sent to the Department. She said "there's no reason" why she did not have the Department review the therapist's reports to receive credit for seeing a therapist.

She recognized that the plan required her "to obtain and maintain stable employment." But she is not supposed to be employed because she receives Disability and Social Security payments. Also, her having been in and out of the hospital affected her employability.

In all, Mother knew what she had to do to get Child back and admits that she did not do it.

Mother last saw Child in February 2017, which was about two years before trial, while he was in the hospital. From his discharge from the hospital to Hurricane Harvey, Mother did not visit him. In 2018, Mother and Father began

asking King for visitation. Mother said that King "told [her], 'no, I'm not giving you a visit. Your son don't remember you.'" Mother did not ask the court to order a visit. She denied that the reason she refused to visit Child was because he was in a Department office. Mother and Father called a previous caseworker about visits too, but Mother testified that that caseworker responded that she was no longer working the case.

As to Child's medical needs, Mother "receive[d] that training" at the hospital, including "learn[ing] how to take his shots" and "how to do his pump to feed him" and understanding "his G-tube." She has given him some of his needed injections and has cleaned his G-tube. But she has not reinserted the G-tube. Mother recognized that these were medical needs of Child's from two years ago, when he was discharged from the hospital. She does not know "what services he need[s] now."

As to the allegations of Father's domestic violence, Mother testified:

Q. Okay. Then one of the things was about domestic violence. Now did—was there some violence in your relationship with [Father]?

A. I want to say like just arguing—mostly heated arguments. But never, never to where he had to put his hands on me or beating me or anything like that.

Q. You're saying that he never did?

A. No. But we have had heated fights to where it escalated to where one of us had to leave or you know.

There was "fighting" but not "physical fighting." Father did not "beat [Mother] up," but she admitted that their arguments "did get heated" enough "to where 'laws'[6] had to be called out" and where one or the other had to stay somewhere else for "a couple days."

On two occasions, she asked the district attorney's office for a protective order against Father. Both times, she signed affidavits, before a notary, which the office prepared for her. In the earlier of the affidavits, she averred that she believed Father to be "unstable" and that he "will not accept that I no longer want to be involved" in a dating relationship with him, as she had told him over the phone.

Also according to the affidavit, about a month before this phone call, and while pregnant with Child, she asked him to leave her home. He "refused to leave"; "slapped [her] in the face"; and "pushed [her] from behind, causing [her] to fall out of [her] wheelchair." Father "continued to act aggressively[,] so [she] grabbed a knife from the kitchen for [her] protection" and "demanded that he leave the house." She and her neighbors called the police, and Father "was aggressive with the officer that arrived," resulting in his later pleading guilty to "Interference with Duties of a Public Servant."

Later in the affidavit, she described an even earlier argument that also took place while she pregnant with Child. Father "picked [her] up out of [her]

---

[6]     We assume that Mother is here referring to police officers.

wheelchair and threw [her] to the ground." He "slapped [her] arms and face several times" and told her "not to call the police" and also "apologized."

Finally in this affidavit, Mother described another incident from about a year before this throwing incident. Father "became very angry" while she "was talking to a young man at [her] brother's apartment." Father "threatened that if he ever caught [her] talking to another man, there would be consequences." Mother inferred from this a "threat to hurt or kill" her.

In the later affidavit, Mother described the hospital incident involving Father's spitting and the bystander. She averred that Father "exit[ed] the hospital," "approached [her] in an aggressive manner," "tried to spit on [her]," and "screamed at [her] for not being with [Child] in the hospital." Father then "became involved in a physical altercation with" the bystander and pleaded guilty to the ensuing charge of assault bodily injury.

About a month prior, and also according to the affidavit, Mother again tried to end her and Father's relationship. Father "threatened that[,] if [she] left him, there was going to be a problem." Mother felt threatened, so she asked her sister to come pick her up. Father "stood in front of the door to prevent [her] from leaving" but, after letting her by, "grabbed the back handles of [her] wheelchair." "He agreed to let [her] go because he saw that the neighbors were outside."

29

In both protective-order cases, the cases were dismissed "[b]ecause [Mother] didn't go forward with it." She "never went back" because she separated from Father, her sister lived with her, and her sister could "give a little more protection" to her.

At trial, however, Mother testified that she made the affidavits because of *the Department*. She "was threatened by CPS basically telling [her] . . . if you don't go make this affidavit on [Father], we are going to take your son as of now." She described the threats as "[b]asically stating that, 'look, if you don't go and do this, we're gonna take your kid.'" She admitted, though, that she had the chance to read over the affidavits before signing them, she did read over them, and she signed them under oath.

She denied that she ever said that Father spit on her and described some other of the later affidavit's contents as not "truthful"—they are not what she said. As to the earlier affidavit, she denied that Father ever "picked [her] up by [her] shirt" and that she ever told the district attorney's office that. She also denied the affidavit's statements that Father "picked [her] up out of [her] wheelchair and threw [her] on the ground and threaten[ed] to kill [her]" and other of its statements.

Mother also testified about Child's half-siblings. He has two brothers and two sisters. The brothers live outside Texas, and the sisters, aged 17 and 18, live with an aunt. The sisters had been living with Mother before she went to the rehab

facility. But the brothers do not live with her because she is "trying to get back on [her] feet." They have been away for two years.

She admitted that Child "tested positive for marijuana" when he was born. The time around his birth was the last time she used marijuana though. She does not use any other illegal drugs.

Mother testified that she and Father both love Child. She does not believe her or Father's parental rights should be terminated.

## III. Trial Results

After trial, the court ruled that Father's parental rights were terminated under predicates (E), (N), and (O); that Mother's rights were terminated under predicates (N) and (O); and that the terminations were in Child's best interest. To clarify the grounds supporting the terminations, the Department's counsel said in open court: "We're agreeing that [the hot-water incident] wasn't the reason for removal. We've already agreed to that. And the hot-water incident was not the reason for removal. It was the 'acting a fool' at the hospital and not being able to take care of the child, and that's been stipulated to."

**Termination of Father's and Mother's Parental Rights to Child**

In three issues, Father contends that the evidence is legally and factually insufficient to support the trial court's findings under statutory predicates (E), (N), and (O). In three issues, Mother contends that the evidence is legally and factually

insufficient to support the findings under predicates (N) and (O) and to support the best-interest finding.

## I.    Standard of Review

Termination of parental rights requires proof by clear and convincing evidence. TEX. FAM. CODE § 161.001(b); *In re J.M.T.*, 519 S.W.3d 258, 265 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). The Family Code defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *J.M.T.*, 519 S.W.3d at 265. Here, the Department was required to establish, by clear and convincing evidence, that Father's and Mother's respective acts or omissions satisfied one of the predicate grounds listed in Family Code subsections 161.001(b)(1)(A)–(U) and that the terminations of Father's and Mother's parental rights were in the child's best interest. *See* TEX. FAM. CODE § 161.001(b)(1)–(2); *In re N.G.*, No. 18-0508, 2019 WL 2147263, at *1 (Tex. May 17, 2019) (designated for publication); *J.M.T.*, 519 S.W.3d at 265.

To affirm a termination judgment on appeal, we need uphold only one statutory predicate—in addition to upholding a challenged best-interest finding—even if the trial court based the termination on more than one predicate. *N.G.*, 2019 WL 2147263, at *1. Two of the statutory predicates—161.001(b)(1)(D) and (E)—

involve acts or omissions that endanger the child. When a parent's rights have been terminated under either of these two predicates, and the parent challenges either or both of the predicates on appeal, an appellate court must "detail its analysis for an appeal of termination of parental rights under section 161.001(b)(1)(D) or (E)." *Id.* at *4. As relevant here, because Father appeals the termination of his rights under predicate (E), we will detail our analysis under that predicate.

When analyzing an appellate issue about the legal sufficiency of parental-rights-termination evidence, we review all the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible. *Id.* This does not mean that we must disregard all evidence that does not support the finding. *Id.* Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence. *Id.* Therefore, in conducting a legal-sufficiency review in a parental-termination case, we must consider all of the evidence, not only that

33

which favors the finding. *J.M.T.*, 519 S.W.3d at 265–66 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005)).

When analyzing an appellate issue about the factual sufficiency of the evidence, the higher burden of proof in termination cases alters the appellate standard of review. *Id.* at 266 (citing *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002)). "[A] finding that must be based on clear and convincing evidence cannot be viewed on appeal the same as one that may be sustained on a mere preponderance." *C.H.*, 89 S.W.3d at 25. In considering whether evidence rises to the level of being clear and convincing, we must consider whether the evidence is sufficient to reasonably form in the mind of the factfinder a firm belief or conviction as to the truth of the allegation sought to be established. *J.M.T.*, 519 S.W.3d at 266 (citing *C.H.*, 89 S.W.3d at 25). We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.*

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108

(Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109.

The natural rights that exist between parents and their children are of constitutional dimension. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 347 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Therefore, termination proceedings should be strictly scrutinized, and the involuntary termination statutes should be strictly construed in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *Earvin*, 229 S.W.3d at 347. However, "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.*, 89 S.W.3d at 26; *Earvin*, 229 S.W.3d at 347.

## II.   Predicate Finding as to Father under Family Code subsection 161.001(b)(1)(E)

In Father's first issue, he contends that the evidence was legally and factually insufficient to support the termination of his parental rights under Family Code subsection 161.001(b)(1)(E)'s predicate. That statute provides that the court may order termination of the parent–child relationship if the court finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the

physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E).

For purposes of this statutory predicate, to "endanger" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re B.S.C.F.*, No. 01-18-00907-CV, 2019 WL 1246281, at *6 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, pet. filed) (mem. op.). It involves "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533; *B.S.C.F.*, 2019 WL 1246281, at *6.

"[I]t is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Boyd*, 727 S.W.2d at 533; *see also* TEX. FAM. CODE § 101.009 ("'Danger to the physical health or safety of a child' includes exposure of the child to loss or injury that jeopardizes the physical health or safety of the child without regard to whether there has been an actual prior injury to the child."). "[R]ather, it is sufficient if the parent's conduct endangers the child's well-being." *B.S.C.F.*, 2019 WL 1246281, at *6 (citing *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)).

"The endangering conduct does not have to occur in the child's presence." *Id.* (citing *Walker*, 312 S.W.3d at 617). "[D]omestic violence may constitute

endangerment, even if the violence is not directed at the child." *In re Z.M.L.*, No. 01-19-00007-CV, 2019 WL 2528205, at *7 (Tex. App.—Houston [1st Dist.] June 20, 2019, no pet. h.) (mem. op.) (quoting *D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.)).

"The conduct may occur before the child's birth and either before or after the child's removal by the Department." *B.S.C.F.*, 2019 WL 1246281, at *6 (citing *Walker*, 312 S.W.3d at 617). "A parent's past endangering conduct may create an inference that the past conduct may recur and further jeopardize the child's present or future physical or emotional well-being." *Id.* (citing *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.)). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* (quoting *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Here, there is evidence that Father engaged in endangering conduct by engaging in violent conduct toward Mother, arguing with Mother such that law-enforcement or other security were often called to intervene, being imprisoned twice, failing to prepare to care for Child's medical needs, and failing to complete his family service plan's requirements that bear on Child's future safety and stability. *See Z.M.L.*, 2019 WL 2528205, at *7 (quoting *D.N.*, 2016 WL 1407808,

at *2); *B.S.C.F.*, 2019 WL 1246281, at *6 (citing *Walker*, 312 S.W.3d at 617). This evidence includes:

- Mother's protective-order affidavits,

- Deputy Davison's involvement and needing to get Father to calm down,

- Soudelier's calls for security help at the hospital,

- her conclusions that neither parent is prepared to meet Child's medical needs,

- her observations of Father's intermittent aggression coinciding with suspected substance abuse,

- his prison time for assaulting the bystander and for possession of a controlled substance,

- that a bystander intervened to protect Mother from him, and

- his failure to complete the requirements of his family service plan that were addressed to avoiding future domestic violence.

Father argues that this evidence is insufficient to support a finding under predicate (E) for five reasons. First, he asserts that he actually "was frequently at his son's side in the hospital" and "attended classes to prepare him to meet his son's medical needs upon discharge." Father cites no evidence for these assertions. Testimony from Soudelier, King, and Father himself suggests the opposite—that there were reasons he did not, or was unable to, visit Child and that Soudelier believed he was not ready to care for Child's medical needs.

Second, Father points out that the Department "never claimed [Child's] burns were the result of abuse or neglect." True enough. The Department's trial

38

counsel stated as much. But Father's other jeopardizing conduct stands independent of the cause of Child's burns.

Third, he asserts that he "did not actively engage in conduct he knew would result [in] jeopardiz[ing] the health and safety of [Child]" but was instead merely "upset at mother for not being at the bedside of their son who was soon to be discharged." On the contrary, during the altercation at the hospital, he was so demonstrably upset that both Soudelier and the bystander thought that Mother needed immediate help. Father's conduct toward Mother, on this occasion and on earlier ones, drove Mother and others to call for assistance. The bystander episode is not an isolated occurrence. Similar interventions happened several times with Deputy Davison, at least once at the hospital, and other times as recounted in the protective-order affidavits.

Father argues that this is nothing more than "[e]vidence of [his] cantankerous nature" and is not "clear and convincing evidence that he had engaged in violent acts." The measure of endangerment, however, is "to expose to loss or injury; to jeopardize." *See Boyd*, 727 S.W.2d at 533; *B.S.C.F.*, 2019 WL 1246281, at *6. Less-than-violent conduct can suffice: "conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *B.S.C.F.*, 2019 WL 1246281, at *6 (quoting *R.W.*, 129 S.W.3d at 739). Father's failure, in Soudelier's eyes, to complete medical training

to care for Child; his failure to complete the violence-focused therapeutic services in his plan; and his two imprisonments are not necessarily "violent acts" toward Child or Mother. But they nonetheless subject Child to a life of uncertainty and instability endangering his physical and emotional well-being.

Fourth, Father attacks Soudelier's credibility for purportedly being "frustrat[ed]" with him, considering Mother's hygiene to be "odious," and thinking of both Father and Mother as "unpleasant" and "difficult." But credibility determinations were for the factfinder; they are not for us. *See H.R.M.*, 209 S.W.3d at 108. In addition, Soudelier's testimony is not so incredible that we must disregard it. *Cf. J.F.C.*, 96 S.W.3d at 266. She had objectively verifiable reasons to be concerned about Father and Mother, specifically, safety to others and protecting Child's wounds from infection. After all, Father did assault the bystander, earning him prison time. And the trial court was within its rights to believe Soudelier about the risk to the healing of Child's burn injuries caused by Mother's repeated unhygienic conduct, even after offers of help.

Fifth, Father points out that Mother's trial testimony contradicted her protective-order affidavits. On this much, Father is correct. In the affidavits, Mother averred violent, threatening conduct by Father toward her. At trial, she repudiated much of that by testifying that it was not what she actually told the district attorney's office and that Father had never physically harmed her. And she

testified that she no longer lives with Father but with her sister instead, who she believes can help protect her.

This, then, is a conflict in the evidence that the factfinder resolved. *See J.F.C.*, 96 S.W.3d at 266. It was within the factfinder's purview to resolve it in favor of believing the protective-order affidavits for at least two reasons. First, those affidavits were sworn, and Mother read over them before signing them. Second, Mother testified that her sister can help protect her now, but, if Father had never physically harmed her, what purported need for protection is she referring to? These two reasons gave the factfinder the latitude to resolve this evidentiary conflict in favor of its endangerment finding. *See id.* We therefore will not disturb the finding on these grounds. *See id.*

We hold that there is legally and factually sufficient evidence to support the trial court's finding that termination was justified as to Father under predicate (E). Therefore, we overrule Father's first issue and need not address his second or third issues, which contest predicates (N)[7] and (O). *See* TEX. R. APP. P. 47.1; *N.G.*, 2019 WL 2147263, at *1; *B.S.C.F.*, 2019 WL 1246281, at *7.

---

[7] Father's appellate brief also contains the argument that, "even if this Court finds the evidence sufficient to support the predicate grounds for termination, the judg[]ment should be overturned." He supports this argument with a citation to Family Code section 263.101, cases addressing predicate (N), and factual arguments about the Department's purported lack of diligence in working with Father on his family service plan.

41

**III. Predicate Finding as to Mother under Family Code subsection 161.001(b)(1)(N)**

In Mother's first issue, she contends that the evidence was legally and factually insufficient to support terminating her parental rights under Family Code subsection 161.001(b)(1)(N)'s predicate. That statute provides that the court may

---

Family Code section 263.101 says, "Except as provided by Section 262.2015, not later than the 45th day after the date the court renders a temporary order appointing the department as temporary managing conservator of a child under Chapter 262, the department shall file a service plan." The trial court appointed the Department as Child's temporary managing conservator on April 19, 2017, and the Department filed Father's and Mother's plans on June 16, 2017—58 days later.

To the extent Father's is an argument that Section 263.101 requires a reversal under these circumstances, Father cites no authorities, and we have found none, requiring a reversal of a parental-rights-termination decree for the Department's violation of Section 263.101 by filing a plan 13 days late. Father otherwise admitted that he knew of his plan's requirements and did not complete them. He had about a year and a half to complete them. Also, Father makes no claim that his due-process rights were violated by the Department's failure to file his plan timely. *See, e.g.*, *In re B.L.H.*, No. 14-18-00087-CV, 2018 WL 3385119, at *8 (Tex. App.—Houston [14th Dist.] July 12, 2018, no pet.) (mem. op.) (citing *In re T.T.F.*, 331 S.W.3d 461, 464 (Tex. App.—Fort Worth 2010, no pet.)); *In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *31–32 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.); *In re S.K.S.*, No. 06-11-00014-CV, 2011 WL 2462030, at *2 & n.2 (Tex. App.—Texarkana June 21, 2011, no pet.) (mem. op.).

To the extent this is an argument under predicate (N), we need not reach it because of our conclusion as to Father under predicate (E).

To the extent this is a best-interest argument under Subsection 161.001(b)(2), Father has not cited any authorities or analyzed his factual arguments about the Department's purported lack of diligence under the relevant best-interest factors. He has therefore forfeited any best-interest argument for inadequate briefing. *See* TEX. R. APP. P. 38.1.

order termination of the parent–child relationship if the court finds by clear and convincing evidence that the parent has

> constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and:
>
>> (i) the department has made reasonable efforts to return the child to the parent;
>>
>> (ii) the parent has not regularly visited or maintained significant contact with the child; and
>>
>> (iii) the parent has demonstrated an inability to provide the child with a safe environment;

TEX. FAM. CODE § 161.001(b)(1)(N).

The first element, about the Department's reasonable efforts to return the child to the parent, "focuses on [the Department's] conduct; the second and third elements focus on the parent's conduct." *In re A.K.L.*, No. 01-16-00489-CV, 2016 WL 7164065, at *6 (Tex. App.—Houston [1st Dist.] Dec. 8, 2016, pet. denied) (mem. op.) (quoting *In re A.L.H.*, 468 S.W.3d 738, 744 (Tex. App.—Houston [14th Dist.] 2015, no pet.)). In assessing the Department's efforts, "ideal efforts" need not be shown—only "reasonable efforts." *In re N.K.T.*, No. 01-16-00439-CV, 2016 WL 6277415, at *8 (Tex. App.—Houston [1st Dist.] Oct. 27, 2016, no pet.) (mem. op.); *In re S.R.*, No. 12-14-00238-CV, 2015 WL 302493, at *2 (Tex. App.—Tyler Jan. 23, 2015, pet. denied) (mem. op.).

Implementation of a family service plan is ordinarily considered a reasonable effort by the Department to return a child to his or her parent. *N.K.T.*, 2016 WL 6277415, at *7; *In re N.R.T.*, 338 S.W.3d 667, 674 (Tex. App.—Amarillo 2011, no pet.). The parent's "failure to complete a family service plan demonstrates an inability to provide a child with a safe environment." *A.K.L.*, 2016 WL 7164065, at *7 (citing *In re A.D.*, 203 S.W.3d 407, 411–12 (Tex. App.—El Paso 2006, no pet.)). The child's "'environment' includes more than just the physical condition of his or her home. Rather, [it] refers to the acceptability of the child's living conditions, as well as a parent's conduct in the home." *Id.* at *8 (citing *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

Here, there is evidence of constructive abandonment by Mother during the Department's temporary managing conservatorship of Child for at least six months and of Mother's failure to regularly visit or maintain significant contact with Child. The trial court named the Department as temporary managing conservator on April 19, 2017. Six months from that date was October 19, 2017. Mother herself testified that she last saw Child just before his discharge from the hospital, which was in February 2017. She testified that she did not visit Child after the discharge. And she testified that she first asked King about visits in 2018. So, though she also

44

testified that difficulties contacting King hindered her from setting up visits, those circumstances occurred after October 2017.

Hurricane Harvey's effects on Mother do not change the analysis here. Mother's and others' testimony suggests that, from the time of the hurricane (late August 2017) to at least October 2017, she lived with Father. Both Father and Mother testified that Mother asked for visits indirectly through Father's requests. However, Father's testimony about when he first asked for visits generally dovetails with Mother's: they first asked for visits in 2018, after King became involved in the case. Father and Mother did suggest elsewhere in their testimony that they called a previous caseworker to set up visits. But there is no clear indication of when those calls occurred. Mother's testimony suggests that they occurred only after King had taken over because the other caseworker's response to the calls was that she was no longer assigned to the case. Given all this, there is no specific contrary evidence to undermine the reasonable conclusion that Mother did not attempt to see Child from April 19, 2017, to October 19, 2017, Hurricane Harvey notwithstanding. *See In re J.Q.J.*, No. 01-18-01094-CV, 2019 WL 2292991, at *5 (Tex. App.—Houston [1st Dist.] May 30, 2019, no pet.) (mem. op.) (affirming termination under predicate (N) even though parent *had* visited child three times).

There is also evidence of the Department's reasonable efforts to return Child to Mother, in the form of the family service plan. King and Mother agree that Mother knew of her plan's requirements. Mother had been through a Department proceeding before, and she knew that she needed to complete her plan in order to get Child back. She herself testified that (1) she has not "completed all of the tasks"; (2) "[t]here's none in there that [she] ha[s] completed"; (3) she "do[es]n't really . . . have an excuse"; and (4) she "know[s] when you go through CPS, you have to do what they state for you to do because [she] went through it before, and [she] ha[s] done it all before." *See N.K.T.*, 2016 WL 6277415, at *10 (relying on the holding in *In re V.D.A.*, No. 14-14-00561-CV, 2014 WL 7347776, at *6–7 (Tex. App.—Houston [14th Dist.] Dec. 23, 2014, no pet.) (mem. op.), that "evidence was sufficient to support a finding that the Department made reasonable efforts to return child to parent even though father denied knowledge of his service plan, claimed that he never received a copy of the plan, and disputed that caseworker discussed plan with him").

Finally among predicate (N)'s elements, there is evidence of Mother's demonstrated inability to provide Child with a safe environment. Soudelier's concerns about Mother's hygiene's effect on Child's healing wounds; Mother's admissions about missing the parenting, domestic-violence-therapy, and -education classes; and her admission about not knowing what medical needs Child has now

(in contrast to her knowing about his needs during his hospitalization) all suggest that she cannot give him the safety—medical or otherwise—that he needs.

Mother contests the "reasonable efforts to return" and "not regularly visited or maintained significant contact" elements under predicate (N). *See* TEX. FAM. CODE § 161.001(b)(1)(N)(i)–(ii). Her examples of her "maintain[ing] significant contact with her son" are her spending the night in the hospital with him several times, leaving phone messages for the caseworker about visits, trying but failing to send Child cards, and trying to call him on his birthday. Our analysis above disposes of the hospital stays and the phone messages. There was a six-month constructive abandonment, post-hospital-discharge, and there is no specific evidence suggesting efforts by Mother to avoid an abandonment during that time. As for the cards and birthday call, even parents who successfully visit their child while he or she is in the Department's care are subject to having their parental rights terminated for constructive abandonment. *See J.Q.J.*, 2019 WL 2292991, at *5. The failed attempts at the cards and the call fall short of even one successful interaction with Child.

She also contests the Department's "reasonable efforts to return," arguing that King failed to communicate with her diligently or to explain her plan to her and that Mother was naive about the system. Mother's own admissions about her

47

plan, knowing its requirements, failing to meet them, and understanding the resulting consequences defeat these arguments.

We therefore hold that there is legally and factually sufficient evidence to support the trial court's finding that termination was justified as to Mother under predicate (N). Accordingly, we overrule Mother's first issue and need not address her second issue, which contests predicate (O). *See* TEX. R. APP. P. 47.1; *N.G.*, 2019 WL 2147263, at *1; *B.S.C.F.*, 2019 WL 1246281, at *7.

## IV.  Best-Interest Finding as to Mother under Family Code subsection 161.001(b)(2)

In her third issue, Mother contends that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in Child's best interest. (Father does not challenge the best-interest finding as to him.)

The Supreme Court of Texas has identified factors that courts may consider when determining whether a termination is in the child's best interest, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individual seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by the individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent

that may indicate that the existing parent–child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *J.M.T.*, 519 S.W.3d at 268. This is not an exhaustive list, and a court need not have evidence on every factor listed in order to make a valid finding as to the child's best interest. *C.H.*, 89 S.W.3d at 27; *J.M.T.*, 519 S.W.3d at 268. While no one factor is controlling, analysis of a single factor may be adequate in a particular factual situation to support a finding that termination is in the best interest of the child. *J.M.T.*, 519 S.W.3d at 268.

In addition, the Family Code sets out factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* TEX. FAM. CODE § 263.307(b)(1)–(13); *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *J.M.T.*, 519 S.W.3d at 268–69. Those are:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

49

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;

> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

> (C) guidance and supervision consistent with the child's safety;

> (D) a safe physical home environment;

> (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

> (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE § 263.307(b)(1)–(13).

The evidence supporting the statutory predicates may also be used to support a finding that the best interest of the child warrants termination of the parent–child

relationship. *C.H.*, 89 S.W.3d at 28; *J.M.T.*, 519 S.W.3d at 269. In conducting the best-interest analysis, a court may consider not only direct evidence but also circumstantial evidence, subjective factors, and the totality of the evidence. *J.M.T.*, 519 S.W.3d at 269; *In re H.D.*, No. 01-12-00007-CV, 2013 WL 1928799, at *13 (Tex. App.—Houston [1st Dist.] May 9, 2013, no pet.) (mem. op.).

## A. *Holley* factors

Factor one is neutral: there is no evidence of whether Child desires that Mother retain her parental rights. *See J.M.T.*, 519 S.W.3d at 270.

Factor two slightly favors termination. Mother admitted being unaware of Child's current medical needs. King testified that the foster mother is meeting Child's specific needs, that Child has improved drastically while with the foster mother, and that Child is receiving needed occupational and physical therapy in the placement. *See id.* On the other hand, Mother's testimony suggests that she desires to provide Child with what he needs to heal and to grow, and terminating her parental rights risks distancing Child from his biological siblings.

Factor three slightly favors termination. No testimony suggests that the foster placement is emotionally or physically dangerous to Child. As to Department custody, King admitted that it would be better for Child not to be with the Department indefinitely. While there was evidence of endangering conduct by Father, it was undisputed that Mother no longer lives with him. All these

51

competing facts are therefore mixed. Soudelier's testimony about how Mother's hygiene could affect Child's wounds' healing, however, pushes this factor slightly in the direction of termination because it is some evidence of physical danger in Mother's current home.

Factor four slightly favors termination. There is no evidence about the Department's parental abilities, as the "individual" currently seeking custody of Child. The only evidence about the foster mother's parental abilities indicates that Child is receiving needed therapy and improving under her care and that Child has bonded with her and her other children. *See id.* at 271.

Factor five is neutral. There is no evidence about programs available to the Department or to the foster mother. The evidence about Child's therapy while in the foster placement does not indicate whether it is program-assisted or provided by the foster mother only.

Factor six slightly favors termination. The Department plans for the foster mother to adopt Child, the foster mother agrees, and all indications are that the foster placement has been beneficial to Child. *See id.* The adoption, however, risks distancing Child from his biological siblings.

Factor seven slightly favors termination for the same reasons as under factor six and for an additional reason. The evidence suggests that Mother's housing has

not stabilized. She has moved from Father's home, briefly to medical rehab, and into her sister's home. She is still in the process of applying for housing assistance.

Factors eight and nine slightly favor termination, largely because of the evidence under predicate (N) as to Mother, including the evidence of failure to complete the family service plan. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013); *J.M.T.*, 519 S.W.3d at 269–70. That evidence is somewhat mitigated by Mother's insistence that she will work toward completing her plan for as long as it takes to benefit Child.

### B. Family Code subsection 263.307(b) factors

Factor one cuts slightly against Mother. Child continues to recover from his burn injuries, requiring occupational and physical therapy. He is receiving that therapy in the foster mother's care, and Mother's hygiene presented at least some risk to his healing.

Factors two through five and seven through nine are neutral for lack of evidence relevant under the factors and because of the Department's counsel's concession that it was not seeking termination for Child's burn injuries.

Factor six cuts slightly against Mother. The only evidence of a developmental evaluation of any kind of Child is King's conclusion that he is benefitting from the therapy and care that he is receiving with the foster mother. There is no other evidence of psychiatric, psychological, or developmental

evaluations of Child, Father, Mother, other family members, or others who have access to Father's and Mother's homes.

Factors ten and eleven cut against Mother. She admittedly failed to complete any of her family service plan's requirements, even after having about a year and a half to do so. Though she testified that she is willing to complete the plan, she admitted that she had little excuse for having failed to complete it thus far.

Factor twelve cuts slightly against Mother. She testified that she had learned how to take care of some of Child's G-tube-related needs but admitted that she did not know what his current needs are. She also admitted not having completed the plan requirements related to learning to recover from and address domestic violence. But it is also undisputed that Mother no longer lives with Father.

Factor thirteen is neutral. The testimony suggests both that Child has bonded with his foster mother's children and that he has biological siblings with whom he could interact.

* * *

After viewing all of the evidence in the light most favorable to the best-interest finding, seven *Holley* factors slightly favor termination, two are neutral, and none favor retaining Mother's parental rights. And under the Subsection 263.307(b) factors, two cut against Mother, three cut slightly against Mother, the remaining eight are neutral, and none favor Mother.

We therefore conclude that the evidence was sufficiently clear and convincing that a reasonable factfinder could have formed a firm belief or conviction that termination of Mother's parental rights was in Child's best interest. *See J.F.C.*, 96 S.W.3d at 266; *J.M.T.*, 519 S.W.3d at 271–72. We further conclude that, viewed in light of the entire record, any disputed evidence could have been reconciled in favor of the trial court's finding that termination of Mother's parental rights was in Child's best interest or was not so significant that the trial court could not reasonably have formed a firm belief or conviction that termination was in Child's best interest. *See H.R.M.*, 209 S.W.3d at 108; *J.M.T.*, 519 S.W.3d at 272. Therefore, after considering the relevant factors under the appropriate standards of review, we hold that the evidence was legally and factually sufficient to support the trial court's finding that terminating Mother's parental rights was in Child's best interest. Accordingly, we overrule Mother's third issue.

## Conclusion

We affirm the trial court's judgment.


Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Hightower.

55